Daniel **NOLAN** et al., Plaintiffs,

v.

John **FITZPATRICK** et al., Defendants
(two cases).

Nos. 71–1156, 71–1166.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1971.

Decided Nov. 4, 1971.

John Leubsdorf, with whom Michael B. Keating, Foley, Hoag & Eliot, Boston, Mass., and Max D. Stern, Cambridge, Mass., were on brief, for Daniel Nolan and others.

Charles E. Chase, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Criminal Div., were on brief, for John Fitzpatrick and others.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Plaintiffs Nolan and LeFebvre, two prisoners confined at the Massachusetts Correctional Institution at Walpole, have brought this action to challenge the constitutionality of that prison's total ban on prisoner letters to the news media concerning prison affairs. Plaintiffs have exhausted their administrative remedies under state law and seek a declaratory judgment and injunctive relief, invoking the jurisdictional provisions of 28 U.S.C. § 1343 and the substantive provisions of 42 U.S.C. § 1983.

The district court granted a declaratory judgment and issued an injunction under which prison authorities retain wide discretion. The authorities may refuse to mail a letter if they "have reasonable ground (not necessarily probable cause) to believe that the contents of the letter or the addressee of the letter presents a risk (a) to the security of the public, the prison administration, or the prison population, or (b) to the observance of rules of behavior by prisoners, or (c) to the rehabilitation of prisoners * * *." 326 F.Supp. 209, 217, 218 (D. Mass.1971). Both parties appeal, the officials contending that the total ban should be upheld and the prisoners contending that restrictions, if any, must be drawn more narrowly.

At the outset, we note that the plaintiffs do not challenge the right of prison authorities to read all letters to the press and to inspect them for contraband or escape plans. Nor do they here assert a right to correspond with the news media about matters of public policy or personal affairs unrelated to the prisons. They claim simply the right to send to the media letters concerning prison management, treatment of offenders, and personal grievances arising within the prison. Plaintiff Nolan wrote seven such letters, and plaintiff LeFebvre wrote one; all were returned by the Walpole censor. The following letter, addressed to the Editor of the Boston Record American, is illustrative:

"Dear Sir,

I am writing this letter in regards to an article which I read in your newspaper concerning the work strike at Walpole State Prison. 1/15 [illegible]

I want to thank you for not minimizing our grievances and I would like to point out that the situation in this prison is a great deal more serious than you indicate. Contrary to your statement that 'the Superintendent agreed to discuss our grievances.' This information is incorrect.

The work strike started on Monday afternoon (1/11/71) & continued until late Thursday afternoon 1/14/71.

If you would like to know more about the reasons behind that work strike & other such trouble that has taken place in this prison during these past 10 months, then please contact the above named attorney (482–1390).

> Yours,
> Dan Nolan /s/
> Prisoner, Walpole"

■ Plaintiffs make First Amendment claims under the heads of freedom of speech, freedom of the press, and the right to petition. It is clear that federal courts may no longer refuse to hear such claims. The oft-cited proposition that "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system", Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), must be read in the light of its equally oft-cited contrapositive, that "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law", Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945).

■ Since the challenged total ban does deprive prisoners of all opportunity to write letters to the press, we must, as a threshold matter, determine whether one's freedom to write to the press survives his incarceration. While to our knowledge no court has addressed the precise question, many have concluded that various other First Amendment rights survive.[1] The right to free exercise of religion has given rise to most of the litigation. In Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), the Supreme Court held that a prisoner stated a cause of action in alleging that he was denied permission to purchase certain religious publications and was, because of his religious beliefs, denied other privileges enjoyed by other prisoners. While *Cooper* could conceivably be thought to be grounded in either free exercise of religion or equal protection, it has consistently been interpreted as proceeding on free exercise grounds. *E. g.*, Brown v. Peyton, 437 F.2d 1228, 1230 (4th Cir. 1971); Walker v. Blackwell, 411 F.2d 23, 24 (5th Cir. 1969); Long v. Parker, 390 F.2d 816, 820 n. 17 (3d Cir. 1968). Indeed, the language of these cases suggests the survival of First Amendment rights generally. 437 F.2d at 1231; 411 F.2d at 24. Similar language was used in an opinion holding that prisoners had the right to receive *Fortune News*, a (non-religious) newsletter published by former inmates and often critical of prison authorities. Fortune Society v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y.1970).

We need not adopt the broad principle that a prisoner retains all First Amendment rights to conclude, as we do, that he retains the right to send letters to the press concerning prison matters.[2] In so concluding, we rely primarily on the fact that the condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, peculiarly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his

---

1. Surviving rights are not limited to those protected in the First Amendment. One line of cases has developed a due process right of access to the courts. The development began with Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), and has been extended to the right to correspond with courts, Stiltner v. Rhay, 322 F.2d 314 (9th Cir. 1963), cert. denied, 376 U.S. 920, 84 S.Ct. 678, 11 L.Ed.2d 615 (1964), and with attorneys on matters relating to legal assistance, Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970). *See also* Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). A state statute mandating racial segregation of prisoners has been held to be unconstitutional. Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). *See also* Note, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts, 72 Yale L.J. 506 (1963).

2. We do not consider whether freedom of the press or the right to petition provide independent support for the plaintiffs' claims.

grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear.[3] This does not depend upon a determination that wardens are unsympathetic to the need to improve prison conditions. But even a warden who pushes aggressively for reforms or larger appropriations within his department and before appropriate officials and legislative committees may understandably not feel it prudent to push for more public laundering of institutional linen.

That prisoners themselves have recently begun to realize the importance of a public awareness to any real prospect of change is increasingly demonstrated. The frequency of striking and rioting in the prisons may well derive, at least in part, from this realization. Often, one of the prisoner "demands" in the course of a strike or riot is that press access to the prison be broadened in some respect.[4] Concurrently, the Massachusetts Department of Corrections has taken practical steps which indicate a recognition of the need for more communication between prisoners and the press. By an administrative regulation, the Department now permits newsmen to visit prisoners under most circumstances.[5]

Having concluded that prisoners retain the right to send letters to the news media concerning prison matters, we must still address defendants' argument that state interests unrelated to the suppression of speech justify the restrictions here imposed. The doctrinal framework for our inquiry must come from United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), in which the Supreme Court rationalized the variety of doctrines which it had in the past employed where the government interest was unrelated to the suppression of free expression. Under *O'Brien*, the state's burden in the present case is to establish that the regulation "furthers an important or substantial governmental interest" and that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679.

The ban might be thought supportable either as serving the purpose of prison administration or as implementing the purposes of the criminal law generally. Defendants here stress purposes of the first sort. They contend that permitting letters to the press "would be detrimental to the security and good order of the institution" and that "A prison community is not the ideal setting for dispassionate debate. Aggressive feelings and grudges run high not only against society in general and correction personnel, but also between inmates themselves."

Since the state interest in insuring the security of the guards and the prisoners is surely an "important or substantial" one, we must consider whether the ban's restrictive effect on the First Amendment rights of the prisoners and the public "is no greater than is essential to the furtherance of that interest." This entails a closer inspection of the security interest. One aspect of the alleged threat to security is the expectation that prisoners will write inflammatory letters to the press, that these letters will return to the

3. *See* Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed. 2d 371 (1969).

4. *See, e. g.*, Boston Globe, Sept. 30, 1971, at 5, col. 2 (Superintendent of Walpole grants meeting between newsmen and prisoners after work stoppage).

5. Under the regulation, newsmen may upon written application cover news in the prison and visit individual inmates who give written consent to be interviewed. Only the Commissioner of Corrections can deny permission, although the superintendent of a prison may recommend denial "[i]n those situations where [he] judges that news coverage or access will compromise the security of an institution or the safety of its inmates or staff. * * *" Commissioner's Bulletin 71–6 (Aug. 3, 1971).

prison as letters to the editor or news stories or editorials, and that, finally, they will cause fellow prisoners to strike or riot. We note first that none of the letters written by the plaintiffs in this case was even arguably of this sort—a total ban is clearly not necessary. Furthermore, prisoners are already entitled to receive newspapers critical of prison authorities. If it be thought that the effect of criticism from within the prison is likely to be greater than that of criticism by outsiders, the short answer is that prisoners are quite well able to proselytize directly. In any event, we have no evidence to the contrary.

The most that can reasonably be said is that, depending upon conditions in the prison when the letter or news story based on it *returns* to the prison, some particularly inflammatory letters may create a "clear and present danger" of violence or breach of security. In that extreme case, prison officials can cope with the situation by refusing to admit the dangerous issue of the newspaper to the prison rather than by refusing to mail the letter in the first instance. The rule against mailing is constitutionally infirm in that it permits officials to withhold letters from the mails on the basis of speculation as to what conditions in the prison will be when and if the letter or article derived from it returns.

The First Amendment prohibition against prior restraints applies with even more than its usual force here. In Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court explained that "When clear and present danger of riot, disorder [etc.] appears, the power of the state to prevent or punish is obvious. Equally obvious is it that a State may not unduly suppress free communication of views, religious

or other, under the guise of conserving desirable conditions." 310 U.S. at 308, 60 S.Ct. at 905. The truism about an ounce of prevention helps little in this field, for the prior restraint doctrine is customarily invoked despite the fact that the state's bar against expressing views to an audience may well be a more effective way of protecting public order than would subsequent punishment.[6] Here, since the communication which allegedly creates the danger to security does so only when it returns to the prison, the regulation against mailing is, in a sense, prior to a prior restraint in that it cuts off expression even before the tension between free expression and order has come into being. Beyond this, it unnecessarily cuts off prisoner speech to a quite different and larger audience, the public.

The other aspect of the threat to security, the danger that newsmen will participate in escape attempts or assist in transferring contraband from one prisoner to another, is based upon the dubious assumption that newsmen would be willing to cooperate in such projects. Nor has either party suggested that letters involving such threats to security would enjoy First Amendment protection. Defendants' practice of reading outgoing mail, unchallenged here, permits them to thwart these possible breaches of security without imposing a total ban.

Defendant relies as well on the state interest in minimizing the expenses of administration. A flat ban on all letters to the press is obviously inexpensive to administer. It requires little of the censor's time to stamp "Rejected" on a letter, and prison officials need not spend time responding to issues which these letters raise. But on the present facts, the state interest in minimizing expenses

6. "Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint." Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 180–181, 89 S. Ct. 347, 351, 21 L.Ed.2d 325 (1968). *See also* T. Emerson, The System of Freedom of Expression 342–44 (1970).

does not rise to the level of an "important or substantial" interest. Defendant has made no showing that the costs of censorship would be prohibitively increased by the need to read a moderate number of letters to the press.[7] We grant that an official may feel a need to respond to complaints. If his censor reads the outgoing mail, he will be apprised immediately of any complaint and can attach a response if that is warranted. An editor who reads both the complaint and the response may conclude that the complaint is groundless or that further investigation is necessary. If the mail is not censored, an official can respond when contacted by the editor or reporter who is investigating the matter or, if he is not contacted, when the letter or story based on the letter is published. While these responses may well involve some time and worry,[8] prison officials are, after all, public officials and responsible to the people in that capacity. Nor is the burden new in kind—since newsmen are now permitted to visit the prison, the officials have presumably become accustomed to responding to criticism.

Failing a justification on the grounds of the state interests in prison administration, the total ban would nevertheless be constitutional if essential to vindicate important state interests in the criminal law. Traditionally, those interests have been thought to include security of the public (restraint), retribution, deterrence, and rehabilitation.[9] Of these, the interest in providing security for the public by restraining dangerous criminals would justify no more than a proscription of letters which contain escape plans.

The relationship of a letter ban to deterrence or retribution is more complex. Deterrence is thought to be furthered by the mere existence of rules which restrict the activities of the prisoners—that is, both the present prisoners who are subjected to the rules and members of the public who know about them will be deterred from committing crimes. A ban on letters to the press might perhaps have this effect. Retribution is based on the notion that it is a moral good that a person who has been convicted of a crime should suffer.[10] On this account of the state interest in the criminal law, the deprivation of the right to send letters to the press would, like any other deprivation, be retributive.[11]

7. We note that some prisons impose no restrictions on outgoing mail. *See* Rhem v. McGrath, D.C., 326 F.Supp. 681, 690 (1971) ; Turner, Establishing the Rule of Law in Prisons: A Manual for Prisoners' Rights Litigation, 23 Stan.L.Rev. 473, 480 n. 40 (1970).

8. Despite its observation that "It is indisputable that prison 'writ writers' like petitioner are sometimes a menace to prison discipline and that their petitions are often so unskillful as to be a burden on the courts which receive them", the Supreme Court nevertheless invalidated a prohibition against a prisoner's providing legal assistance to another prisoner. Johnson v. Avery, 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969).

9. "It has been thought that the purpose of punishment is to reform the criminal; that it is to deter the criminal and others from committing similar crimes; and that it is retribution." O. W. Holmes, The Common Law 36 (M. Howe, ed. 1963). For a discussion of the manifestations of these purposes in the criminal law, see Note, Beyond the Ken of the Courts : A Critique of Judicial Refusal to Review the Complaints of Convicts, 72 Yale L.J. 506, 516–26 (1963). *See also* Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971).

10. *See* H. L. A. Hart, Postscript: *Responsibility and Retribution*, in Punishment and Responsibility 231 (1968). For a brief effort to distinguish retribution from related purposes of expiation, revenge, and retaliation, see Griffiths, Review, The Limits of Criminal Law Scholarship, 79 Yale L.J. 1388, 1418–20 (1970). Justifications of the ban here in issue on the basis of these related purposes would be subject to similar infirmities.

11. This argument is weakened by the notion that retributive punishment must be tailored to the crime. H. L. A. Hart, *supra* note 10, at 231. Here, all prisoners are subject to the ban indiscriminately.

But the important question is not whether this ban may conceivably have a deterrent or retributive effect, but whether the use of this ban is essential to achieving those effects. In holding that prisoners retain certain rights in prison, the courts have implicitly held that certan deprivations are not essential to the furtherance of these purposes: the argument which would justify all rules proves too much. Lacking evidence that the deprivation which a ban on letters to the press imposes is essential to deterrence or retribution, we hold that it is not. A similar "all-rules" argument as to rehabilitation, that prisoners must learn to follow rules in order to become acceptable members of society, is similarly unpersuasive.

Additionally, however, defendants might assert that the ban on letters to the press has specific rehabilitative functions, both as to the prisoner who writes the letter and as to other prisoners. But the argument that the writing of a grievance letter is psychologically corrosive remains unelaborated, and the weight of scholarly opinion is that rehabilitation is served instead by permitting the prisoner to retain or develop an opportunity to express his ideas.[12] Nor are we persuaded that newsmen addressees are likely to interfere with rehabilitation.

Finally, defendants argue that the rehabilitation of other prisoners would be hindered by the disruption which would attend the return of the letters to the prison by way of the media. But this is the security argument in a different guise. For the reasons suggested above, the First Amendment mandates that prison officials cope with the danger by refusing to readmit the dangerous material rather than by refusing to mail the letter in the first instance.

Accordingly, while we are not unmindful of the district court's serious efforts to draw guidelines of operable utility, we conclude that adherence to the constitutional standard is not ensured by broad "reasonable ground" discretionary powers even though these be linked to proper penological objectives. We therefore remand to the district court with directions to enter a judgment declaring that plaintiffs have a right to send letters to the press concerning prison management, treatment of offenders, or personal grievances except those which (a) contain or concern contraband or (b) contain or concern any plan of escape or device for evading prison regulations.

We add this postscript. Subsequent to argument in this case, we have been informed by counsel that defendants have voluntarily adopted new procedures permitting outgoing mail of prisoners to be sent without restriction as to addressees. While such administrative initiative is a welcome constructive step, it does not moot the issue, since the policy can at any time be changed. It does, however, persuade us that injunctive relief is not presently indicated.

Reversed and remanded.

---

12. *See, e. g.*, Barnes & Teeters, New Horizons in Criminology 492 (3d ed. 1959); N. Leopold, *What is Wrong with the Prison System*, in The Tasks of Penology 21, 38–39 (H. Perlman and T. Allington eds., 1969); Note, The Right of Expression in Prison, 40 S.Cal.L.Rev. 407 (1967). In cases involving free exercise of religion, courts have made a similar point. "Religion in prison subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality." Barnett v. Rodgers, 133 U.S.App. D.C. 296, 410 F.2d 995 (1969).