**Richard GOODWIN et al., Plaintiffs-Appellees,**

v.

**Russell G. OSWALD, Commissioner of Correctional Services of the State of New York, et al., Defendants-Appellants.**

**No. 776, Docket 72-1307.**

United States Court of Appeals, Second Circuit.

Argued April 13, 1972.

Decided June 19, 1972.

Judith A. Gordon, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for defendants-appellants.

Barbara A. Shapiro, New York City (William E. Hellerstein, The Legal Aid Society, Richard A. Greenberg, New York City, of counsel), for plaintiffs-appellees.

Jack Greenberg and Stanley A. Bass, New York City, on the brief for NAACP Legal Defense and Educational Fund, Inc., and National Office for the Rights of the Indigent as amici curiae.

Before FRIENDLY, Chief Judge, and SMITH and OAKES, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This appeal raises interesting and difficult questions concerning the balance to be struck between prisoners' sixth and fourteenth amendment rights and the need to allow prison officials discretion to exclude communications they feel will endanger their institutions. The United States District Court for the Southern District of New York, Charles Tenney, Judge, granted a preliminary injunction to plaintiffs, prisoner-members of the Prisoners' Labor Union at Green Haven ("the union") holding that

they must be allowed to receive a letter from their attorneys containing legal advice about the formation of the union and efforts to have it officially certified, and all letters from the Legal Aid Society, in accordance with the provisions of Administrative Bulletin No. 20 (January 31, 1972) of the Department of Correctional Services. The order was not given effect, as this court granted a stay and expedited the appeal of the Commissioner of Corrections and the Superintendent of Green Haven, who claim that the court below erred in his estimate of the effect the letters would have and abused his discretion in granting preliminary relief and allowing the letters to enter the allegedly tense prison. We find error only in the extent of relief granted and modify and affirm the grant of preliminary injunction.

The case presents three basic issues: (1) whether the court was incorrect in finding, on constitutional grounds, that the officials were unjustified in withholding the letters; (2) whether it was proper to require obedience to Administrative Regulation No. 20, which sets a standard for censorship of legal mail that is more lenient than constitutionally required; and (3) whether the conditions which justify issuance of a preliminary injunction exist. We are not faced on this appeal with the question of the constitutionality or legality of unions or other organizations of prisoners, but only with the right of prisoners to receive communications from counsel whose advice has been sought on that question. We do not therefore intimate any views as to the legality, desirability, dangers or possible benefits of any type of prisoner collective bargaining on prison working conditions or of any other organized representation of prisoners.

The inmates at Green Haven, a maximum security institution at Stormville, New York, holding 1900–2000 men, began during the summer of 1971 to organize a labor union to act on their behalf in connection with conditions of labor in the prison. They contacted the Legal Aid Society's Prisoners' Rights Project for assistance in this endeavor. The Project was told, when it inquired of the Commissioner, that prisoners are not in an employee-employer relationship with the Department of Corrections and that the Department would not recognize any inmate labor organization because "it would be contrary to the best interests of the Department and of the general welfare of the prison population." In December, 1971, the Project received the signatures of approximately 800 inmates requesting the attorneys to draft a union constitution and represent them in union-related matters. The constitution was sent to the inmates; though it may have been signed and become effective, by its own terms, the union has thus far taken no action. Legal Aid also provided authorization forms to sign up new union members.

The communication which is the subject of this suit was sent by Legal Aid during the week of February 7, 1972 to all those inmates who had signed up as members of the union but to no one else. In the packet sent to each inmate the main document was a seven-page letter detailing legal steps being taken on behalf of the union and giving legal advice on a number of union matters. A copy of the letter to the Commissioner requesting recognition of the union, the union constitution, and press releases issued February 7 announcing the formation of the union and commitments of support for it by prominent individuals, were included. On February 9, the Commissioner told Legal Aid that he would deny recognition to the union; a week later he informed the Society that he had not and would not deliver the February 7 letters to the 980 addressees. Apparently, fifteen of the letters had arrived unsealed and were examined by prison officials; on the basis of this scrutiny the authorities had decided to withhold the letters. The next day, the 18th, Legal Aid filed a petition with the Public Employees Relations Board requesting certification of the union as collective bargaining agent for the prisoners. The present complaint was filed

on February 23; the action was brought under 42 U.S.C. § 1983 and its jurisdictional complement 28 U.S.C. § 1343, and plaintiffs requested a preliminary injunction ordering the defendants to deliver the communications from their attorneys.

Affidavits were submitted to the court by both sides; neither requested an evidentiary hearing. The defendants argued that their action was justified because the formation of a union was against prison policy and would jeopardize their control of the institution. They interpreted the letter as a declaration that the union was "operational" and as an incitement to "concerted activity" that would present a clear and present danger of disruption to the institution. They anticipated that if the letters were delivered, and they were then obliged to burst the balloon of rising expectations by proscribing union activity, they would subject themselves to danger.

■ The court found that the letter was a communication of legal advice, not a call to illegal action, and that its optimism about the formation of a union was carefully hedged with cautionary instructions to obey all prison rules in the interim, which might be lengthy, before the union was certified and could negotiate with prison officials. The court held that the letter came within the "legal mail" classification of Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, sub nom. Oswald, Correction Commissioner et al. v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), and neither violated the standards applicable to such mail nor presented a clear and present danger to the security of the institution. The court felt that the resort to legal methods of challenging the prison's refusal to countenance unions and of improving the prisoners' status was a constructive and rehabilitative rather than a dangerous move. The withholding also violated the Commissioner's own Administrative Regulation No. 20, and the court ordered that rule followed in the future.[1] He held the class of all inmates proper under Rule 23(b)(2). He was not entirely clear on the issues of irreparable injury and balance of hardships.[2] The only issues for this court are whether the court made clearly erroneous findings of fact or abused his discretion in ordering the warden to deliver the letters from Legal Aid and to abide by his mail regulation in the future. The court's easy characterization of the Legal Aid letter as pure legal advice may be open to question, as it was somewhat more ambiguous than that, but we hold that he was quite correct in his assessment of the appropriate legal standard and his application of it to the facts of the case.

The main letter from the Prisoners' Rights Project attorneys is addressed to "Dear Union Member" and begins by remarking on the public announcement of that day and by noting the possibility of affiliation with already existing unions. The letter goes on: "Now that your union is ready to function we have been requested to provide further legal advice as to the role it can play, how it will operate, and how to deal with problems that may arise." The letter continues with a recitation of efforts to induce the Commissioner to recognize the union as the collective bargaining agent for the inmates; if he denies it recognition, the attorneys state that they will file a petition with the Public Employees Relations Board (PERB). The letter in

---

1. The rule on mail from attorneys is as follows: "You may correspond with any attorney on legal matters or regarding your legal rights. Your incoming and outgoing letters and enclosures will be opened and examined in your presence to insure the absence of contraband. The contraband will be censored."

2. In Marsh v. Moore, 325 F.Supp. 392 (D.Mass.1971), cited by the court below, the withholding of mail from an attorney to his client concerning a pending legal matter was held to be irreparable injury in the preparation and prosecution of the case, and to warrant preliminary relief.

general and the above sentences in particular had a positive tone about the probable outcome of the PERB proceeding and the chance that the union would be functional in the relatively near future that undoubtedly seemed unwarranted and threatening to the state. The letter advised inmates that it was crucial that they obey all institutional rules during the certification process before PERB and, if necessary, in the courts.

The letter goes on to describe the issues the union would treat were it certified; certain of these paragraphs have a note, once again, of confident assumption that the recognition of the union is an event whose occurrence is quite certain rather than merely marginally possible. Most of the sentences, however, use the verb "would" rather than "will," thus keeping the tone conditional. The letter mentions the fact that the prison officials have not objected to solicitation of union members over the preceding months and presents the Project's view on why a union would serve the interests of the inmates more effectively than a liaison committee serving at the discretion of the administration. The letter ends with a warning that should the administration resist the union, the process of obtaining recognition will be long and arduous; the belief expressed is that the union "will eventually succeed" rather than that it will begin negotiations tomorrow.

The constitution sets forth as union goals the advancement of the economic, political, social and cultural interests of the prisoners, the adoption of laws increasing the welfare of prisoners, and the equalization of the rights of prison labor and free labor by expansion and recognition of the former. There are clauses on dues, meetings, and other routine matters. The press releases raise no problems.

Before discussing the specific factors operative in this situation, we review the constitutional context in which the claims of the plaintiffs arise. As convicted prisoners, they are denied the full panoply of constitutional rights which citizens normally enjoy. But among the basic rights which they do retain in prison are certain of the first amendment freedoms and the sixth and fourteenth amendment right of access to the courts. It is the latter right which is principally involved here, although there are first amendment overtones, recognized by the lower court, in this situation.[3] The right of a prisoner to access to the courts was first articulated by the Supreme Court in Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). Since then, the boundaries of the right has been further delineated; a necessary concomitant to the right of access is the right to assistance of counsel. See, e. g., McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed. 2d 718 (1969); Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.), aff'd sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S. Ct. 250, 30 L.Ed.2d 142 (1971). In turn, the provision of effective assistance requires the opportunity for confidential communication between attorney and client on pending litigation and related legal issues. Coleman v. Peyton, 362 F.2d 905 (4th Cir.), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966); McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1966); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y. 1970); Fulwood v. Clemmer, 206 F. Supp. 370 (D.D.C.1962). This court and others have recognized the primary im-

---

3. On the first amendment rights of prisoners, *see* Barnett v. Rodgers, 133 U.S. App.D.C. 296, 410 F.2d 995 (1969); Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); Seale v. Manson, 326 F. Supp. 1375 (D.Conn.1971); Payne v. Whitmore, 325 F.Supp. 1191 (D.Cal. 1971); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970); Sobell v. Reed, 327 F.Supp. 1294 (S.D.N.Y. 1971). *See generally* Note: Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87 (1971).

portance of mail in this attorney-client relationship and have granted it protection from interference by prison staff in all but extraordinary circumstances. Sostre v. McGinnis, *supra*; Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970); Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971), aff'd 454 F.2d 696 (1st Cir. 1972); Marsh v. Moore, *supra*; Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970). *See* Corby v. Conboy, 457 F.2d 251 (2d Cir. 1972); Wright v. McMann, 460 F.2d 126 (2d Cir. 1972). *Cf.* Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952).[4]

The standard which applies to attorney-client mail in this circuit was formulated in Sostre v. McGinnis, *supra*; in distinction to other correspondence, which may be read and censored for material which inhibits or threatens rehabilitation, security, or other professed goals of incarceration, mail to or from attorneys is rarely proscribed:

> The generous scope of discretion accorded prison authorities also heightens the importance of permitting free and uninhibited access by prisoners to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. The importance of these rights of access suggests the need for guidelines both generous and specific enough to afford protection against the reality or the chilling threat of administrative infringement. Thus, we do not believe it would unnecessarily hamper prison administration to forbid prison authorities to delete material from, withhold or refuse to mail a communication between an inmate and his attorney (citations omitted) or any court . . . unless it can be demonstrated that a prisoner has clearly abused his rights of access. . . . [I]f a communication is properly intended to advance a prisoner's effort to secure redress for alleged abuses, no interest would justify deleting material thought by prison authorities to be irrelevant to the prisoner's complaint. The chance that an official will improperly substitute his judgment for that of the correspondent then preponderates. For similar reasons, prison officials may not withhold . . . material from otherwise protected communications merely because they believe the allegations to be repetitious, false, or malicious. [442 F.2d at 200–201]

The state argues that under any of the relevant tests the letter was properly excluded from the prison. Citing Roberts v. Pepersack, 256 F.Supp. 415 (D. Md.1966), which held that it was permissible to punish an inmate who had called for a demonstration against prison conditions, and McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964), in which similar restriction was held permissible even though the advocacy was not a call to action but merely a dissemination of political or social views, the defendants urge that this is an analogous situation in which the first and sixth amendment rights of the inmates may be curtailed in order to prevent an incitement to concerted effort to evade institutional rules. Nor, defendants claim, can this threatening behavior hide behind a purported attorney-client relationship when in essence it is not bona fide legal advice. *See* Sostre v. McGinnis, 442 F.2d at 200; McCloskey v. Maryland, 337 F.2d at 74.[5]

---

4. As the court said in Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970), "that prison inmates do not have all the constitutional rights of citizens in society—and may hold some constitutional rights in diluted form—does not permit prison officials to frustrate vindication of those rights which are enjoyed by inmates or to be the sole judges—by refusal to mail letters to counsel—to determine which letters assert constitutional rights." 430 F.2d at 551.

5. If the documents do not constitute a call to illegal concerted action against the institution, then the appellants claim

The answer to the question of which category the letter from Legal Aid falls into—whether it urged illegal concerted action, was merely correspondence by interested persons, or was communication to clients giving legal advice on actions intended to challenge and improve the conditions of confinement—seems to us reasonably clear, although because prison unions are very new we find no cases directly on point. Most of the cases deal with representation in criminal cases, on habeas corpus petitions, or in civil rights actions, under 42 U.S.C. § 1983. The attorneys here might be said to be taking action analogous, though on a larger scale, to a section 1983 action, trying to establish a right, possibly derived from the first and thirteenth amendments, for the prisoners to associate and try to lessen the harshness of prison work conditions and contribute to the success of training and rehabilitation programs.[6] Nor does the fact that the union was declared "operational" remove this letter from the realm of advice, for there is a valid and significant distinction between the existence of the union and its certification as an operating bargaining agent. To apply to PERB, the union had to be in existence, and the letter made it clear that the group could not deal with the officials yet, that the certification was a potentially lengthy legal proceeding, and that thinking about the issues the union might eventually raise (while obeying all prison rules) was the only concerted action inmates ought to take at present. They were not urged to change their work habits or to present any demands to the administration. A finding that this is not propaganda or incitement cannot be termed clearly erroneous.

Under the test for attorney-client mail, the state must show clearly an abuse of access in order to justify restriction. Defendants claim that such an abuse exists here, because the letter advocated an "unlawful scheme," one instance mentioned by the *Sostre* court in which some restriction would be permissible. The contention that an application for recognition of the union and communication with one's clients preparatory to such application are components of an unlawful scheme seems a misuse of that term. The lawyers were telling the prisoners to utilize lawful, not unlawful channels for the presentation of grievances and were guiding a challenge to a prison rule through orderly procedures. It is difficult to discern in what other fashion the prison would prefer to have the rule examined; it is the only peaceful method by which it can be reviewed by someone other than the Commissioner or his deputy, who are naturally interested in quelling any inmate activity which may arrogate to inmates themselves some decision-making power about the conditions of prison life.

Legal Aid points out, as the district court found, the inconsistency between

---

that they are merely correspondence between members of the public and the inmates that may be censored, as "many kinds of controls on the correspondence of the inmate" are constitutionally permissible. *Sostre, supra*, 442 F.2d at 199. Limits on those to whom he can write and on what he can say and censorship to remove offensive material are permissible. *See* Administrative Regulation No. 20, paragraph 12.

We think, however, the letter and documents cannot properly be termed merely correspondence sent to the prisoners by interested members of the public. The Legal Aid Society had no involvement in prisoner unions before they received the letter from the prisoners in Green Haven asking for advice on the formation of such a group. The letter specifically gave a legal opinion on how to form a union, its legal status, possible powers, etc. This appears to us bona fide legal advice despite the somewhat over-enthusiastic language in some parts of the letter. That language, given the clearly expressed lack of intent to incite any violence against the institution, does not change the legal nature of the letter.

6. The rule in *Sostre* and most other cases is not limited to certain forms of legal action but extends to communication on any legal questions and issues intended to obtain redress for alleged unconstitutional rules or actions.

the officials' tolerance of the solicitation and mailing of authorization forms and the intolerance of a legal opinion which they undoubtedly never expected and with which they vehemently disagree. Given the fact that they allowed the solicitation which raised inmate hopes, their argument about the danger that will result from the disillusionment they will have to cope with on the heels of the Legal Aid letter seems highly disingenuous. They can hardly claim that to allow the prisoners to read a letter will be more disruptive than to deny them all word of the result of their organizational efforts of several months. In fact, the state conceded this point at oral argument; counsel stated that her clients did not object to a letter advising the inmates of the applicable law and recent events, but that the objection to the present letter was that it assumed the union was "operational." This objection has been disposed of above.

■ Despite the fact that the letter was not within that category of legal mail which constitutes an abuse of access, defendants claim that the existence of a clear and present danger to the security of the institution justifies the exclusion. When such a danger exists, it has been held permissible to restrict even those most basic and "preferred" freedoms of individuals. A standard for such danger in a prison context has been set forth in Fortune Society v. McGinnis, *supra* n. 3, with which we agree: that in order to justify official interference, the state must show "a compelling state interest centering about prison security, or a clear and present danger of a breach of prison security, * * * or some substantial interference with orderly institutional administration." 319 F.Supp. at 904.

■ The Commissioner, in an affidavit by an assistant attorney general, claims that the distribution of the letter would impair the orderly administration of the institution by creating an alternate source of authority to challenge the officials. However, the union's legality is being adjudicated in another proceeding, and the introduction of the letters will not lead irresistibly to that result before the conclusion of that other procedure; it merely keeps the parties to that proceeding informed of its progress and of issues on which they may have to advise counsel. He emphasized his fear of reprisals when, after delivery of the letters, he is obliged to inform the inmates that the union can never exist. As the very issue of its right to negotiate is being litigated in another forum, he need not and cannot honestly tell the inmates that it "can never" exist, but merely give his opinion on the probable outcome of that proceeding. And defendants' fears that their own response to the letters will in turn cause a disturbance cannot justify a refusal to deliver them.[7] Finally, the Superintendent states that he expects fights between pro and anti-union inmates.

These conclusory predictions are based on the fact that there are approximately ten fistfights a week at the institution (which houses 1900 inmates) and that there have been threats against several guards over a period of months and a few unfounded rumors of "trouble." But during this past fall of anxiety and disruption at prisons in New York and elsewhere, Green Haven was quiet; and we conclude that no factual basis is shown for the dire predictions of the defendants. Compare the situations in Lee v. Washington, 390 U.S. 333, 88 S. Ct.994, 19 L.Ed.2d 1212 (1968); Rhem

**7.** Nolan v. Fitzpatrick, 326 F.Supp. 209, 214–217 (D.Mass.1971). *Cf.* Edwards v. South Carolina, 372 U.S. 229, 231, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Terminiello v. Chicago, 337 U.S. 1, 5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Of course, the likelihood of the communications themselves causing breach of security or of prison discipline or substantial interference with administration is to be measured in the light of the situation within the institution, rather than the conditions outside portrayed in *Edwards* and *Terminiello*.

v. McGrath, 326 F.Supp. 681 (S.D.N.Y. 1971); Long v. Parker, 390 F.2d 816, 822 (3d Cir. 1968). *See* Davis v. Lindsay, 321 F.Supp. 1134 (S.D.N.Y.1970).

■ We conclude that the court was correct in requiring the delivery of the letters and enclosures. The judgment, however, goes further and requires adherence to the present departmental regulation on attorney mail. This regulation goes beyond the requirements of *Sostre* in requiring that attorney mail be opened in the presence of the inmate, presumably to insure that it is checked only for contraband and is not read for content. This would inhibit the chilling effect of any procedure under which the inmate must trust prison staff not to read an opened letter. While we feel that this policy is desirable, (and has been required in the First Circuit, *see* Smith v. Robbins, 454 F.2d 696 (1972) ) and urge the Commissioner to pursue it, we think it unnecessary to go so far and to freeze the regulations on this matter on this appeal on the narrow issue of the present Legal Aid letters. The issue here is confined to mail from that source, in accordance with the principles set out herein. The injunction may be modified to require only the delivery of the letters and enclosures described above, and other mail from Legal Aid to the prisoners concerning their union claims and other legal problems.

OAKES, Circuit Judge (concurring):

By my concurrence in Judge Smith's able and thorough opinion, I do not wish to indicate agreement with the strict lines drawn by Sostre v. McGinnis, 442 F.2d 178, 200–201 (2d Cir. 1971) (en banc), cert. denied, 405 U.S. 978, 92 S. Ct. 1190, 31 L.Ed.2d 254 (1972), for as I pointed out in concurring in Wright v. McMann, 460 F.2d 126 (2d Cir., 1972), *Sostre* itself invites a reexamination in particular cases of the extent to which

there may be prison interference with inmate mail. 442 F.2d at 201. The First Circuit, since *Sostre*, has taken what seems to me a little closer look at this issue than the court in *Sostre*, with many, many questions before it, was perhaps able to do. *See* Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972), aff'g 328 F. Supp. 162 (D.Me.1971) (Gignoux, J.). *See generally* Note, Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87, 108–111 (1971). *See also* Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971) (prisoners' letters to news media).

Much less by my concurrence do I wish to indicate agreement with McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964), or any other case which permits the inhibition—even in the absence of a clear and present danger and even with "less drastic means" [1] available—of inmates' first or sixth amendment rights. Perhaps these disclaimers are made out of an abundance of caution, but this is an expanding area of law where considerable flexibility of judicial viewpoint seems warranted. The principal portion of this concurrence is, however, directed to the underlying assumptions of the skillfully put dissenting opinion.

There is nothing in federal or state constitutional or statutory law of which I am aware that forbids prison inmates from seeking to form, or correctional officials from electing to deal with, an organization or agency or representative group of inmates concerned with prison conditions and inmates' grievances. Indeed, the tragic experience at Attica, *see* Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971), would make correctional officials, an observer might think, seek more peaceful ways of resolving prison problems than the old, ironclad, solitary-confinement, mail-censoring, dehumanizing methods [2] that have worked so poorly in

---

1. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *see* Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

2. *See, e. g.*, Wright v. McMann, 460 F.2d 126 (2d Cir. 1972); Rodriguez v. McGinnis, 456 F.2d 79 (2d Cir. 1972) (en banc), petition for cert. filed, 40 U.S.L.W. 3523 (U.S.Apr. 24, 1972) (No. 71–1369);

the past.[3] Promoting or at least permitting the formation of a representative agency might well be, in the light of past experience, the wisest course for correctional officials to follow. A recognition of the need for new initiatives may be what prompted the Superintendent at Green Haven initially to permit the circulation of "organization cards."

In this instance the proposed representative agency—perhaps for polemic or organizational reasons, perhaps to promote easier understanding of its purposes among the inmates, or perhaps because the civilian analogy was an apt one—has been designated as a "union" (whether by the inmates themselves or the Legal Aid Society does not appear). This has raised many specters—strikes, picketing, meetings, grievance procedures, jurisdictional disputes—that we associate with union-management controversy. And even if treated as rhetorical in part, the "union," as the dissent rightfully points out, is proposed to engage in "collective bargaining" on the inmates' behalf.

The formation of a prisoners' "union," even in its nonrhetorical sense, does not

strike me as a proposal totally unacceptable to society. Indeed, unless positive steps are taken by "management"—the correctional authorities themselves—to meet legitimate grievances, radically to change a system that is at least one hundred years behind the times,[4] and wholly to alter what Chief Justice Burger has referred to as the tendency "to regard all criminals as human rubbish," [5] one may surmise that inmate "unions," or at least some form of collective inmate representation, are inevitable. Social progress may be slow in forthcoming, but yesterday's illegal conspiracy is today's legitimate agency and tomorrow's constitutional prerogative, and the history of organized labor in the United States is not all that inept or far-fetched an analogy.

It may be, as the dissent quite rightly points out, that the advice given the inmates of Green Haven by the Prisoner's Rights Project of the Legal Aid Society was neither all "legal" advice nor all sound.[6] But the role of the lawyer in American society is a fluid one, and now we not only have legitimized group legal practice,[7] but have recognized that a

Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970) ; cf. Attica inmate Edward Young, quoted in N.Y. Times, Apr. 15, 1972, at 35, col. 1 (city ed.) ("You don't have to put a hand on me to degrade me"). See also, e. g., Rabinowitz, The Expansion of Prisoners' Rights, 16 Vill.L. Rev. 1047 (1971).

As the New York City Board of Correction put it recently: "Alienated from the community and from the Criminal Justice System itself, prisons have become warehouses of human anguish and mirrors of social injustice." Crisis in the Prisons: New York City Responds 3 (1971 New York City Board of Correction Ann.Rep.).

3. See, e. g., Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971). New York is by no means alone, however. See, e. g., Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971) (Va. prison system's disciplinary procedures violative of due process) ; Jackson v. Hendrick, 40 U.S.L.W. 2710 (Philadelphia, Pa.Ct.C.P., Apr. 7, 1972) (Philadelphia prison conditions violative of first, sixth, eighth and fourteenth amend-

ments to United States Constitution). In New York City prisons there are some encouraging first steps. See Crisis in the Prisons: New York City Responds (1971 New York City Board of Correction Ann.Rep.).

4. "Generally, prisons have not yet caught up to the Cincinnati Declaration [the Declaration of Principles of 1870 at the Cincinnati Prison Conference]." Spaeth, The Courts' Responsibility for Prison Reform, 16 Vill.L.Rev. 1031, 1039 (1971).

5. 5 Trial 15 (Oct.-Nov. 1969).

6. One doubts, for example, that recognition by the PERB would be forthcoming, given the language of N.Y. Civil Service Law, Art. 14.

7. Legal Aid itself is group practice for the indigent, and if union members can be represented as a group, Brotherhood of R.R. Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964) ; see NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), why not prison inmates? I do not see any difference be-

lawyer's advice to his clients, to be complete, may have to go beyond the traditional narrow concepts of Anglican jurisprudence and involve matters not wholly "legal" in nature, by earlier definition. *See generally* B. Abel-Smith & R. Stevens, In Search of Justice (1968).

As to the form of the advice, at least one reading of the Society's proviso in its proposed letter that recognition of the union is dependent upon "the administration [being] willing to proceed in good faith" may be that it simply states fact (in the light of the administration's having permitted the circulation of organization cards in the first instance), although the Society's choice of language does subject it, unhappily as the dissent points out, to an alternative construction that was unnecessary and undesirable. Thus, it is true that, while not earthshaking perhaps, the words "in good faith" might better have been omitted. I cannot help but feel, however, that a prison administration wise enough to have permitted circulation in the first instance would not, absent an overly defensive reaction, have given the unfriendly alternative construction credence by an answer.

The dissent expresses the view, and a respectable one it is, that judges must be very careful not to substitute their judgment for that of correctional officials. The dissent also properly points out that our federal system demands that federal judges must be particularly careful to let the states handle their internal administrative problems, absent federal questions. Here, however, unless it is assumed that prison inmates do not have first and sixth amendment rights collectively to consult counsel and to communicate with counsel about individual and collective grievances as to prison conditions, there is a plausible,

proper basis for federal judicial intervention. *Cf., e. g.,* Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); Gignoux, J., in Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971), aff'd, 454 F.2d 696 (1st Cir. 1972).

The extent of judicial intervention, whether state or federal, of course, may not exceed the strict limitations upon the scope of review of administrative action. Here the judge gave no weight to the correction officials' expressed fear of "open hostilities," apparently because there was no substantial evidence to support it. In doing so he did no more than, for example, the First Circuit Court of Appeals in Nolan v. Fitzpatrick, *supra* (prison ban on letters to press regarding inmate grievances not sustained despite alleged threats to prison security). The extent of permissible judicial review of correction officials' action would seem to be no different from the extent of permissible review of the actions of the NLRB, the FPC, the ICC, the CAB, and the like. As Chief Judge Bazelon of the District of Columbia Circuit Court of Appeals said, in the context of judicial review of treatment of mental hospital inmates, "many people seem to accept judicial scrutiny of, say, the effect of a proposed dam on fish life, while they reject similar scrutiny of the effect of psychiatric treatment on human lives. . . . While the importance of this factor can be overestimated, in the law as in all other areas we tend to accept the accustomed and fear the new." Bazelon, Implementing the Right to Treatment, 36 U.Chi.L. Rev. 742, 743 (1969).

Nor is judicial nonintervention justified by the record's failure to disclose an attempt by the Legal Aid Society to avoid this "federal case" by casting its proposed letter in a form acceptable to

---

tween representing one and representing several hundred inmates. Indeed, this court approved the practice in respect to an injunction request against brutality. Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12, 24–25 (2d Cir. 1971). This practice becomes more

understandable when, as here, the Legal Aid Society no doubt represented many of the Green Haven inmates *before* their incarceration and apparently was *asked* by those seeking to form a union to represent them.

the Green Haven "management." We do not know the extent to which the determination of the Society to institute legal action was influenced by views informally or publicly expressed by correctional officials. We do know that the "management" took the flat position on February 9 that it would deny recognition to the inmates' "union," thereby negating any subsequent negotiation on the terms of the proposed letter.

In my view, it is not altogether irrelevant that the Prisoner's Rights Project of the Legal Aid Society has responsibly done a great deal—for example, through its quiet but persistent representation of individual inmates having judicial as well as prison grievances, and, as disclosed by the record in Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971), through its prompt efforts on behalf of the inmates of Attica—to warrant taking a charitable view of its efforts at Green Haven. One can surmise that the Society's efforts have tended to help defuse by legal means what the tragedies at Attica indicate is an explosive situation in the New York state prison system. If the views expressed in this opinion tend to give the Society the benefit of the doubt, it is a benefit in short the writer believes earned.

FRIENDLY, Chief Judge (dissenting):

On this appeal we see The Legal Aid Society, a venerable organization long supported by private charity and more recently also by large public grants, assuming the role of solicitors for a prisoners' union.[1] The officials in charge of discipline at Green Haven Prison, a maximum security institution, regarded the despatch to hundreds of inmates of the massive communication here at issue, most of it unnecessary on any view, as a threat to the maintenance of order. Respect for proper federal-state relations forbids that their judgment should be cast aside.

Judge Smith rightly criticizes the district judge's "easy characterization of the Legal Aid letter as pure legal advice," condemns the "positive tone about the probable outcome of the PERB [Public Employees' Relations Board] proceeding," and censures the note "of confident assumption that the recognition of the union is an event whose occurrence is quite certain rather than merely marginally possible." While one would have supposed that these sound observations alone would call for reversal, they are a long way from conveying the full flavor of this case.

The demand of February 7, 1972, attached to The Legal Aid Society's letter to the inmates, was not its first approach to the Commissioner of Correction on recognition of prisoners' unions. The Society had taken up the matter in October, 1971, and was promptly advised by counsel to the Commissioner, with what seems obvious correctness, that "The relationship of the inmates to the Department of Correctional Services is

---

1. Counsel insists that the long letter, on the prestigious letterhead of THE LEGAL AID SOCIETY, PRISONER'S RIGHTS PROJECT, to which were attached copies of a letter to state officials demanding recognition, the union's constitution, a press release of the New York Urban Coalition announcing support for the prisoners' union, and a statement of support from a Congressman, constituted mere legal advice rather than soliciting material. A trained lawyer could indeed read the Society's letter only in that way, although it is hard to see how the press release and the Congressman's statement would fall under that description on any view. In any event, it requires considerable naiveté to suppose that the authors of this long letter expected that all the 980 prisoners who were to receive the bundle would read it as mere legal advice or would refrain from using it to gain adherents to the union, particularly in light of the "positive tone" of the letter conceded by the majority, of which more hereafter. Furthermore, the uncontradicted affidavit of Assistant Attorney General Gordon avers that attorneys of the Society had earlier engaged in solicitation.

not that of an employer-employee," [2] to which alone the Public Employees' Fair Employment Act, N.Y. Civil Service Law, Art. 14, applies, and that consequently "The Department of Correctional Services will not permit nor recognize any inmate labor organization within the Department." Nevertheless, as recounted in Judge Smith's opinion, the Superintendent allowed organization cards to be circulated and signed. Some eight or nine hundred inmates signed authorizations that got into the Society's hands, in ways not clearly revealed by the skimpy record; this, the Society tells us, established a client-lawyer relationship between the inmates and itself for the promotion of a prisoners' union. While the concurring opinion contains interesting discussion, with which I do not disagree, about the desirability of better methods for the communication of prisoners' grievances before these reach the boiling point, there is nothing to indicate that the Green Haven officials would have opposed this, or other formation of prisoner groups, such as one recently described in the press where a NAACP chapter was formed in a federal prison with the full assent of the superintendent. But none of this has any relevance here. The "Dear Union Member" letter stated in no uncertain terms that the union was to engage in *collective bargaining* on salaries, wages, hours and other conditions of employment, with the Legal Aid Society bargaining on the union's behalf in consultation with the inmates, and, as pointed out below, many inmates, few of whom are skilled lawyers, could well have supposed that the bargaining would encompass other matters as well.

The letter, seven pages of single-spaced typewriting, begins by stating that the Union "was publicly announced" on the morning of February 7 at the of-fices of the New York Urban Coalition; that recognition had been demanded; that a Citizens' Advisory Council had been formed; and that the president of the Retail and Wholesale Distributive Workers Union had approved affiliation. The letter proceeds to state that the Society had been requested—just how or in what manner does not appear—"to provide further legal advice as to the role it [the union] can play how it will operate, and how to deal with problems that may arise." It then makes the positive assertion, "The Commissioner and/or the Superintendent are empowered by law to recognize your union as the collective bargaining agent of all prisoners in the institution," although the Society knew (but did not inform its "clients") that the Commissioner believed the contrary, on the best of grounds, and that "grant of recognition would be the simplest and most expeditious way to commence cooperation between your union and the administration in improving conditions," although the Society knew (but did not inform its "clients") that the Commissioner had no intention of doing anything of the sort. After describing the legal steps that would become necessary if the prison officials acted as they had told the Society they would (and in fact did only two days later), the letter contains several pages describing the halcyon future that will—not would—exist when recognition is—not might be—achieved. An important phase of this is "grievance procedures," described so broadly that inmates could well believe that the union would represent them in all matters of prison discipline. Regret is expressed that the union constitution does not provide "for the kind of participation by everyone" that would have been liked, since the prison authorities had stated they would not permit union meetings, a prohibition which, in the So-

2. The Act represented a compromise whereby organizational rights were granted state employees as a *quid pro quo* for prohibition of the right to strike. It goes without saying that prisoners have no such right. Cf. Draper v. Rhay, 315 F.2d 193 (9 Cir.), cert. denied, 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963); Wilson v. Kelley, 294 F.Supp. 1005 (N. D.Ga.), aff'd, 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968).

ciety's opinion, "is contrary to your rights under the United States Constitution"! The letter concluded on "one final note." This was that "the recognition of your union and the successful conclusion of negotiations can be accomplished smoothly and expeditiously, with a minimum of dislocation, provided the administration is willing to proceed in good faith. However, should the administration create unnecessary obstacles, the process can be a long and arduous one."

Plainly this letter, with its wholly unjustified imputation that refusal of immediate recognition by the prison authorities would not be "in good faith"— a serious charge for an organization with the prestige of The Legal Aid Society to put in the hands of hundreds of inmates in a maximum security prison —would have entitled the prison authorities to answer. Indeed, it very likely would have demanded this in the interest of proper administration of the prison. At least, despite the contrary supposition of the concurring opinion, this was what the prison officials thought; the affidavit of an Assistant Attorney General stated that:

> If the subject material were distributed among the inmate addressees, the Administration would be obliged to

notice [sic] those inmates that no "union" would be permitted at Green Haven and that, in its opinion, no "union" had been formed. In the opinion of the Acting Superintendent, open hostilities between the inmates and staff and between pro and anti-union inmates would likely ensue.

I am unable to perceive how, on such facts, a United States district judge can properly substitute his judgment for that of the state officer who is familiar with conditions at Green Haven and, unlike the judge in his quiet chambers, will have to handle trouble if this should occur.[3]

I am unable to follow the suggestion in the concurring opinion that "the extent of permissible judicial review of [state] correction officials' action would seem to be no different from the extent of permissible review of the actions" of various federal agencies provided by federal statutes. Most importantly, it ignores the basic principle of federalism —that whereas Congress can freely decide how far federal courts should be allowed to invalidate federal administrative action, including "the effect of a proposed dam on fish life," a federal judge does not have and could not constitutionally be given a roving commission to invalidate acts of state officers[4]

3. The Legal Aid Society makes some point of the State's failure to submit an affidavit by the Acting Superintendent or to demand an evidentiary hearing. While such a course would have been preferable, the State could have assumed that, after our admonitions in SEC v. Frank, 388 F. 2d 486 (2 Cir. 1968), the district court would not simply brush aside the Acting Superintendent's views, on a matter of public importance, without giving him an opportunity to substantiate them. I might add that I see no reason why this and many other applications under the Civil Rights Act are often handled on a basis that gives the State no adequate opportunity to respond. The application for a temporary injunction was brought on by order to show cause on February 22, five days after the Legal Aid Society was informed that the Commissioner would not deliver the letters. The State was initially allowed only four days (including a weekend) to answer, after the two days

allowed the Society to perform the simple act of serving the papers a few blocks away. Since appellants were actually served with the show cause order on February 23, and the district court at the hearing on February 29 extended their time to answer until March 2, appellants in fact had seven days to answer; the point, nevertheless, retains its force. If ever there was a letter where speed of receipt was unimportant, this was it. As usual, such haste is counter-productive; the letter has now been held up for some four months.

4. The states, of course, have the same power to provide for general judicial review of acts of their officers as the United States has with respect to its own, and New York has been a leader in affording this. The acts of the prison officials here challenged could have been attacked, on much broader grounds, under CPLR §§ 7801 and 7803. This is not meant to

but is limited to determining their conformity with the Federal Constitution, laws and treaties. Beyond that, it was precisely the penchant of some federal judges for substituting their judgment for that of duly constituted administrators that led Congress to enact the substantial evidence rule. If we were reviewing the Acting Superintendent's action simply on the bases set forth in the Administrative Procedure Act rather than on an assumed absolute arising from the Constitution, it would be apparent that the district judge, in the Supreme Court's phrase, had "indulged in an unwarranted incursion into the administrative domain." SEC v. New England Electric System, 390 U.S. 207, 211, 88 S.Ct. 916, 920, 19 L.Ed.2d 1042 (1968). Although the task of line-drawing inevitably remains, federal judges should keep in the forefront of their minds, when passing on the acts of government officials, that they have not been vested with executive or legislative power rather than rush to impose their supposedly superior knowledge, on all sorts of questions, upon the duly appointed officials who have lived with the problems and have been given responsibility to deal with them. Failure to observe such self-limitation will ultimately have most serious consequences.

This case is a classic example of what I have called "the domino method of constitutional adjudication . . ., wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation."[5] As the majority rightly say, although convicted felons do not enjoy the fully panoply of constitutional rights, they are not totally deprived of these, including First and Sixth Amendment rights selectively incorporated in the Fourteenth. While the Sixth Amendment would have no application here since it is limited to the assistance of counsel in criminal prosecutions, I have no difficulty with the proposition that the First Amendment as made applicable to New York by the Fourteenth or, for that matter, the Fourteenth without benefit of the First, requires a state also to allow, under proper safeguards, communications between a prisoner and his lawyer with respect to his personal affairs or alleged prison abuses. But this proposition does not entail either that the state must allow an organization like The Legal Aid Society to become an organizer for a prisoners' union or that 980 prisoners, by signing authorization cards, have established a client-lawyer relation with it. Still less does it entail that the "lawyer" must be allowed to flood the prison with provocative, largely unnecessary and probably unwanted self-styled "advice" which the prison authorities reasonably consider to create a likelihood of disorder.

In view of the tolerant attitude the State officials had already exhibited, it is not at all unlikely that they might have allowed the circulation of a letter informing the inmates that the Society had requested recognition of the union, that it anticipated rejection, and that in that event it intended to pursue such remedies as state law afforded—all the legal advice the inmates needed or could profit from. This is another instance where civil rights lawyers have preferred to make a "federal case" than to try to resolve a matter by discussion. Cf. Negron v. Wallace, 436 F.2d 1139 (2 Cir.), cert. denied, 402 U.S. 998, 91 S.Ct. 2184, 29 L.Ed.2d 164 (1971). So far as the record discloses, the possibility of attempting to get permission to

suggest that exhaustion of state judicial remedies is now held to be required, see Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), and Rodriquez v. McGinnis, 456 F.2d 79 (2 Cir. 1972) (en banc), although the instant case illustrates how advantageous such a requirement would be in prisoner actions, but rather to make clear that if substitution of judicial for administrative judgment is desired in the state area, the substitution should be of state rather than federal judges.

5. Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929, 950 (1965), reprinted in Benchmarks 235, 258 (1967).

**1252**

send a letter like that here outlined was the last thing considered by The Legal Aid Society's eager attorneys, although it would have been the first that would have occurred to any lawyer interested in quickly accomplishing a constructive result. In the absence of any such effort by the Society, the judge might well have applied his talents to endeavoring to work out some solution before utilizing his awesome power to strike down state action.[6]

I, of course, agree with so much of the majority opinion as sets aside the district court's acceding to the request of the Society to utilize the Civil Rights Act to enforce state regulations affording rights to prisoners beyond those accorded by the Federal Constitution, with the attendant consequence of federal contempt proceedings against state officers for mere violations of state law.

---

6. I fail to comprehend the bearing of The Legal Aid Society's efforts at Attica and elsewhere, except perhaps in emphasizing that since the State and the Society will be living together for a long time, the Society would have done better to avoid this confrontation until it had explored the possibility of an agreed solution, such as outlined above.