**THE LUPARAR et al.**

v.

**R. Kent STONEMAN, Individually and as Commissioner of the Department of Corrections of the State of Vermont, and Julius Moeykens, Individually and as acting Warden of the Vermont State Prison at Windsor, Vermont.**

Civ. A. No. 73-95.

United States District Court,
D. Vermont.

Sept. 30, 1974.

Richard S. Kohn, American Civ. Liberties Union of Vermont, Inc., Montpelier, Vt., for plaintiffs.

Alan W. Cook, Asst. Atty. Gen., Montpelier, Vt., for defendants.

COFFRIN, District Judge.

This case presents serious questions concerning the right of prisoners to publish a prison newspaper and the right of the state if such a paper is published to impose guidelines on the types of articles that may be published, to suppress distribution of an issue, and to terminate the publication if it so desires.

The case is grounded upon 42 U.S.C. § 1983 and its jurisdictional complement, 28 U.S.C. § 1343. Plaintiffs seek injunctive and declaratory relief to permit the distribution of the January, 1973, issue of *The Luparar* and its continued publication without interference or censorship by the state. The case is before us on cross motions for summary judgment, defendants having moved to dismiss the complaint, or in the alternative, for summary judgment.

*The Luparar* was a newspaper published monthly by the inmates at the Vermont State Prison starting in December, 1971. At the outset, guidelines for publication were established at a meeting between a group of prisoners and some of the administrative staff. The paper was supported by the state and printed on the offset printing press at the State Prison. In the fall of 1972 there was a change of editors, and defendants allege that the editorial policy of the paper changed radically at this time. They claim that the publication began to carry attacks on personalities in violation of the guidelines that specified, *inter alia*, that issues, not personalities, would be discussed.

In January, 1973, the prison administration notified the newspaper staff that the issue could not be distributed as printed because some of the articles were objectionable. The staff made two attempts to mail copies of *The Luparar* to addresses outside the prison, but the prison mailman refused to accept them for mailing. The prison administration also sought to suppress distribution of the newspaper within the prison, but succeeded in recovering only a few of the five hundred copies printed. Since January, 1973, no issues of *The Luparar* have been published because the staff of the paper refuses to adhere to the 1971 guidelines or to discuss new guidelines, while the state will not allow publication without guidelines.

Plaintiffs are *The Luparar*, John Shuttle, an inmate who is the editor of the newspaper, and Craig Murray, an outside subscriber to the newspaper, who also purports to represent all others similarly situated. Defendants are R. Kent Stoneman, Commissioner of the Department of Corrections of the State of Vermont, and Julius Moeykens, incorrectly styled Michael Moeykens in the complaint who, at the time suit was brought, was Acting Warden of the Vermont State

Prison. Defendants are sued both individually and in their official capacities.

■ Defendants have moved under Fed.R.Civ.P. 21 to drop *The Luparar* and Craig Murray as parties plaintiff. Plaintiffs have no objection to *The Luparar* being dropped and it may be so dropped. Plaintiffs object to dropping of Craig Murray as a party plaintiff, alleging that his right to receive the newspaper was infringed by defendants. Defendants claim that the interests of Craig Murray and the class he represents will be fully considered by the very nature of the suit and thus oppose granting the plaintiffs' motion to maintain the suit as a class action under Fed.R.Civ.P. 23(c).

We believe that maintaining this suit as a class action is unnecessary since, as should be apparent from this opinion, the relief applicable to plaintiff Murray would be applicable to the entire class of subscribers. We therefore deny plaintiffs' motion to maintain the suit as a class action and deny defendants' motion to drop Craig Murray as a party plaintiff.

■■ Defendants' motion to dismiss the complaint for failure to state a cause of action is denied. In an action brought under the Civil Rights Act, the case should not be dismissed for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6) unless it appears to a certainty that the plaintiffs would be entitled to no relief under any state of facts which could be proved in support of their claims. Blair v. Rockefeller, 469 F.2d 641, 642 (2d Cir. 1972); Holmes v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir. 1968). Applying this test, we cannot say that plaintiffs could prove no set of facts which would entitle them to relief, and so we proceed to consider the cross motions for summary judgment.

■ It is well established that the internal management of prisons or correctional institutions is vested in and rests with the heads of those institutions operating under statutory authority, and their acts and administration of prison discipline and overall operation of the institution are not subject to court supervision or control. However, in the case of highly unusual circumstances or a violation of constitutional rights, courts have the power and duty to intervene in the internal affairs of a prison. *See* Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Douglas v. Sigler, 386 F.2d 684 (8th Cir. 1967).

Although plaintiffs and defendants are unable to agree on what precise issues are to be determined, the Court finds the following four issues in this suit. As we see it, the first issue that must be determined is what, if any, first amendment protections apply to the publication of a newspaper by prison inmates and the distribution of the newspaper within and without the prison. The second is whether the state, having permitted an inmate newspaper to be published by state facilities and to be partially supported by state funds, can terminate the publication because it objects to its content. The third issue is whether the state can impose guidelines on the publication. The final issue is whether the state can impose prior restraints upon publication of an issue because it objects to the content.

I

■ The first issue to be determined is whether the publication of a prison newspaper and distribution both inside and outside the prison is protected by the first amendment. Convicted prisoners do not retain "the full panoply of constitutional rights which citizens normally enjoy. But among the basic rights which they do retain in prison are certain of the first amendment freedoms and the sixth and fourteenth amendment right of access to the courts." Goodwin v. Oswald, 462 F.2d 1237, 1241 (2d Cir. 1972). Although the Supreme Court in

Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), expressly withheld its opinion with regard to mass mailings by prisoners, *id.* at 408 n. 11, 94 S.Ct. 1800, 40 L.Ed.2d 224, we feel that the principles applicable to censorship of prisoner mail apply equally to censorship of a prisoner newspaper. The Court in *Procunier* refused to reach the question whether prisoners retained first amendment rights to send and receive uncensored mail. Instead, it based its decision on the first amendment rights of outsiders to carry on an uncensored correspondence with prison inmates. The issue here with respect to subscribers to *The Luparar* such as plaintiff Murray is virtually the same as that in *Procunier*, and we hold that distribution of a prison newspaper to subscribers outside the prison may not be prevented by prison officials unless such distribution would be likely to interfere with the legitimate governmental interests of security, order, and rehabilitation discussed in Procunier v. Martinez, 416 U.S. at 413–414, 94 S.Ct. 1800. Any suppression of a newspaper for reasons other than those would violate the outside subscribers' first amendment rights to receive the newspaper.

As for distribution within the prison, we fail to see how a newspaper that does not threaten security, order and rehabilitation can be withheld from the inmates. However, as the Supreme Court noted in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), first amendment guarantees must be "applied in light of the special characteristics of the . . . environment." It follows, we think, that the same standards that determine whether distribution outside the prison would threaten legitimate governmental interests would apply to distribution within the prison. *See* Procunier v. Martinez, 416 U.S. at 412–414, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). We hold, therefore, that distribution of a prison newspaper within the prison is entitled to the same protections and subject to the same limitations as distribution outside of the prison.

II

■■ We next take up the issue of the state's termination of the publication because of objections to its content. Although cases dealing with prison newspapers are scarce, we find close analogies in the issues raised in cases concerning school and college newspapers. In Joyner v. Whiting, 477 F.2d 456 (4th Cir. 1973), the court said:

> It may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First Amendment. But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment . . . . This rule is but a simple extension of the precept that freedom of expression may not be infringed by denying a privilege. *Id.* at 460 (citations omitted).

In Antonelli v. Hammond, 308 F.Supp. 1329, 1337 (D.Mass. 1970), the court stated, "Having fostered a campus newspaper, the state may not impose arbitrary restrictions on the matter to be communicated." We find this principle as applicable to the prison as it is to the campus. The state is not required to establish or support an inmate newspaper, and once it does so, it can withdraw its approval or support for any reason, except those impermissible under the first amendment. However, once the state has allowed a newspaper to be established, the objection of prison officials, or those in the Department of Corrections, to its editorial content is not a permissible reason under the first amendment to prohibit its distribution.

Nor does the state's financial support of the newspaper compel a different conclusion. In Antonelli v. Hammond, *supra*, the court held that the payment of the newspaper's expenses by the college from funds received from compul-

sory student activity fees did not justify the censorship by the administration, saying:

> We are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is a part of the university structure and is financed with funds controlled by the administration. 308 F.Supp. at 1337.

In Joyner v. Whiting, *supra,* the court said:

> Censorship of constitutionally protected expression cannot be imposed by suspending the editors, suppressing circulation, requiring imprimatur of controversial articles, excising repugnant material, withdrawing financial support, or asserting any other form of censorial oversight based on the institution's power of the purse. 477 F.2d at 460 (footnotes omitted).

At the commencement of the publication of *The Luparar,* the cost of publishing the newspaper was expected to be approximately $30.00 per issue which initially was to come from the inmates' fund and later was to be defrayed, in whole or in part, by subscriptions and contributions.[1] We agree with the reasoning of *Joyner, supra,* and *Antonelli, supra,* and hold that once the state has sanctioned publication of the newspaper, it cannot terminate publication even when financially supported by the state, or suppress circulation in a manner inconsistent with the freedom of expression guaranteed by the first amendment.

 The next question we must decide is whether the publication of *The Luparar* was terminated in a permissible manner under the circumstances. The test we apply is that adopted by Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Court held that censorship of incoming and outgoing prisoner mail is only permissible when it furthers one or more of the substantial governmental interests of security, order and rehabilitation. 416 U.S. at 413, 94 S.Ct. 1800. The Court upheld the decision of the district court invalidating regulations that "authorized, *inter alia,* censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, or religious, or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate.' " *Id.* at 415, 94 S.Ct. at 1812. The Court went on to criticize the actions of prison officials who, under the broad regulations, suppressed unwelcome criticism. Such broad restrictions, the Court held, were not necessary to further a governmental interest unrelated to the suppression of expression and thus were not permissible. *Id.* at 416, 94 S.Ct. at 1812.

The central points of the state's objection to certain articles in *The Luparar* are that the articles are inflammatory,[2] that they attack personalities, not issues, in violation of the November, 1971, guidelines,[3] and that circulation of the articles outside the prison might subject the state to defamation suits.[4] The Court has examined the articles in question, and while it does not in any way approve of their tone and content, it does not find that they threaten the governmental interests of security, order, and rehabilitation, either individually or collectively. The basis for the objections of the state to such articles are similar to the basis for the mail censorship struck down by the Supreme Court in Procunier v. Martinez, *supra.* The fact that an article is critical, attacks personalities, or is even defamatory, is not a sufficient reason standing alone to suppress the publication in which it appears. If the state is concerned about the possibility of libel

---

1. Annex A to Affidavit of Robert G. Smith.

2. Deposition of R. Kent Stoneman at 24, 46.

3. Deposition of Julius V. Moeykens at 40–45, deposition of R. Kent Stoneman at 19–28.

4. Deposition of R. Kent Stoneman at 14–15, 33–34.

suits being brought against it, it could require a disclaimer to be printed in the paper, as was done in Bazaar v. Fortune, 489 F.2d 225 (5th Cir. 1973), aff'g en banc with modification, 476 F.2d 570 (5th Cir.), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).

### III

We do not mean to say, however, that a prison newspaper must be entirely free from regulation. In Joyner v. Whiting, *supra,* the court followed the holding of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and did not rule out all prior restraint, by appropriate regulations, upon publications distributed during school hours on school premises where they can reasonably forecast substantial disruption or material interference with school activities on account of the distribution of such printed material. 477 F.2d at 461. In Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971), the Second Circuit, per Judge Kaufman, noted that any restrictions on distribution or publication of printed or written material would be more serious on a college campus than at a high school because students presumably would spend more time on campus. *Id.* at 808 n.5. *A fortiori,* restrictions would weigh even more heavily in a prison.

This court recognizes that free speech does not mean wholly unrestricted speech and the constitutional rights of prisoners may be modified by regulation reasonably designed to adjust those rights to the needs of the prison environment. *See* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Antonelli v. Hammond, 308 F. Supp. 1329, 1336 (D.Mass. 1970). However, any infringement of individual constitutional freedoms must be adequately related to legitimate governmental interests. In Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, *supra,* the Supreme Court recognized only three legitimate governmental interests justifying censorship of prisoners' mail: prison security, prison order and prisoner rehabilitation. *Id.* at 413, 94 S.Ct. 1800. The Court cautioned that "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction . . . that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." *Id.* at 413–14, 94 S.Ct. at 1811.

We hold that prison officials may unilaterally enact regulations pertaining to publication of a newspaper by prison inmates, but such regulations must be no broader than is necessary to protect the legitimate governmental interests of prison security, prison order and prisoner rehabilitation.

### IV

The final issue with which we are faced is whether the state can exercise prior restraint on the publication of a prison newspaper because it objects to its content. As indicated above, the prison authorities cannot suppress the prison newspaper because of its content unless that content threatens the legitimate governmental interests discussed by the Supreme Court in Procunier v. Martinez, *supra.* The articles objected to by the prison officials in the January, 1973, issue of *The Luparar* do not rise to the level of threatening those governmental interests. We hold that the prison officials may not continue to suppress or prevent distribution of the January, 1973, issue of *The Luparar,* either inside or outside of the prison.

A further issue will arise in light of what we have said earlier if *The Luparar,* or another prison newspaper, is published in the future. While the prison officials may establish guidelines or regulations concerning the content of the newspaper, there must be procedural safeguards if a newspaper,

or parts of it, are found to be in violation of guidelines or regulations. The interest of prisoners and outside subscribers in an uncensored newspaper, based as it is in the first amendment, is clearly a "liberty" interest within the meaning of the fourteenth amendment, even though limited because the newspaper in question is published in prison and therefore may be proscribed from publishing certain items. Nevertheless, such an interest is protected from arbitrary governmental invasion. *See* Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. *See also* Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). We think that a procedure for pre-publication submission by the editors of material to be published for prison administrative approval before distribution is permissible under certain conditions. Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir. 1971). *See* Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In *Freedman*, the Court held that in order to obviate the dangers of a censorship system, the state must assume the burden of proving a film is obscene, secure a judicial determination of a film's obscenity before it may impose a final valid restraint, and reach a final decision whether to restrain the showing of a film within a specified brief time.

We think these requirements are adaptable to the situation here. We do not believe a court determination is necessary before prison officials can act to suppress material submitted to them, since it would cause long delays in publication. However, the prison authorities have the burden of demonstrating a permissible basis for interference with prisoner publications. Courts will not be content with the officials' bare allegation that such a basis existed. We believe that if this burden is met by the prison authorities it will satisfy the intent of *Freedman* when applied to the prison context. *See Eisner, supra*, 440 F.2d at 810. The prison administration must also ensure an expeditious review procedure. To be valid, the regulations must proscribe a definite brief time within which the review of submitted material will be completed. *See id.* In addition, the editorial staff of the prison newspaper must be notified of the rejection of material submitted by it, the reasons for the rejection, and must be given a reasonable opportunity to protest that decision. Complaints about the decision must be referred to a prison official who did not take part in the original determination of suitability for publication. *See* Procunier v. Martinez, *supra*, at 418–19, 94 S.Ct. 1800. These requirements do not appear to be too burdensome to either plaintiffs or defendants, and we believe that clear regulations can establish a procedure that can deal fairly with both the first amendment interests involved and the legitimate interests of the prison officials.

Wherefore, defendants or their successors are hereby ordered:

To cease suppression of the January, 1973, issue of *The Luparar*, to return the copies of that issue that they seized to the editor and staff of *The Luparar*, to permit that issue to be mailed to subscribers outside the prison, to promulgate regulations dealing with the publication of the newspaper if there is continued interest in publishing it, and to provide a review procedure in those regulations in accordance with that described earlier in this opinion.