**James O'CONNELL, Individually and in his capacity as Acting President of the National Prisoners' Reform Association, et al.**

**v.**

**Bradford SOUTHWORTH, in his capacity as Director of the Department of Corrections, and William F. Laurie, Jr., in his capacity as Assistant Director for Adult Services.**

**Civ. A. No. 76–431.**

United States District Court,
D. Rhode Island.

Oct. 15, 1976.

John Edward Farley, Asst. Public Defender, Inmate Legal Assistance, W. Warwick, R. I., for plaintiffs.

Edward F. Burke, Chief Legal Counsel, Dept. of Corrections (R. I.), Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

█ This case is before the Court upon plaintiffs' motion for preliminary injunc-

tion. Plaintiffs, all inmates at the Adult Correctional Institutions (ACI), Cranston, Rhode Island, are the presidents of the National Prisoners' Reform Association, the ACI Jaycees, the Bilalian Society, and the Latin American Society, all prisoners' organizations. Defendant Southworth is Director of the Department of Corrections of the State of Rhode Island. Defendant Laurie is Assistant Director for Adult Services. Together with Frank DePaolo, defendants constitute a three man board entrusted with the task of administering the Inmates' Welfare Fund at the ACI.[1] Plaintiffs complain that in denying a request that money from that fund be used to distribute a leaflet, *see* Appendix A, prepared by the prisoners to the voters of Rhode Island, defendant state officials have impermissibly abridged plaintiffs' First and Fourteenth Amendment right of free expression. The complaint states a claim under 42 U.S.C. § 1983 (1970) and this Court takes jurisdiction under 28 U.S.C. § 1343(3). A hearing on the motion for preliminary injunction was held on October 7, 1976, at which nearly all the relevant facts were stipulated.

### I

The Inmates Welfare Fund consists of funds from at least five sources: profits from pay-telephones and vending machines at the ACI; contraband confiscated from prisoners; contributions from private citizens, especially at the Christmas season; profits from the inmate store;[2] and interest on the unexpended balance of the funds.[3] *See* Appendix B.

During the fiscal year ending June 30, 1976 the fund had income of approximately

1. Although the Court is satisfied that it can proceed to consider preliminary injunctive relief, plaintiffs should consider whether Frank DePaolo is a necessary party who should be joined pursuant to Rule 19, Fed.R.Civ.P.

2. The state chooses to pay the salaries of the two non-inmate store employees out of general state funds. The other expenses incurred by the store are charged to the Inmates' Welfare Fund. The Court does not believe that the state's choice renders the store profits some-

how less truly "inmate funds" than they would be if the state chose—as it could—to pay store employees out of the store's profits. The Court notes that the practice of hiring employees is a change from the earlier practice of running the store with inmate employees.

3. In the fiscal year ending June 30, 1976, the fund recorded income of over $2,800 from interest, indicating a substantial unexpended balance carried over from the previous year.

$31,450 and expenses of $14,450, leaving an unexpended balance of $17,000 as the current year began on July 1, 1976. No part of the fund is appropriated by the state. The parties agree, and have so stipulated, that the unexpended balance, as well as all current income from the fund's regular sources, belongs to the inmates.

Under an arrangement set up unilaterally by the prison officials, the fund is administered by the Director of Corrections, the Assistant Director for Adult Corrections, and the Assistant Director for Business.[4] These officials (hereinafter referred to as "the Board") vote on proposed requests for expenditures of welfare funds. Under the rules [5] they are required to restrict expenditures to "purposes benefitting Adult Correctional Institutions' inmates only" and are permitted to operate on a majority rule basis. Apart from these two rules, their discretion is entirely unfettered.

In the past, the Board has approved a variety of expenditures for such purposes as band equipment ($3,400), baseball uniforms, Christmas gifts for families of inmates, and recreational activities. The fund is also used in part to subsidize a part of the cost of printing and distributing the National Prisoners' Reform Association newsletter. This publication, written and edited by inmates, is distributed free to prison inmates and is also mailed to subscribers throughout the state.

On September 21, 1976, the Board met to consider a request by certain inmates that an expenditure of $2,300 be authorized to pay for a mailing of a leaflet prepared by inmates to all the registered voters of Rhode Island. The leaflet calls the attention of voters to certain alleged abuses in the prison system and urges increased public awareness of the need for prison reform, allegedly thwarted by the current administration.[6] The parties all agreed that no other source of funds is available for mailing the leaflet apart from the Welfare Fund. The inmates' request was denied. Thereupon, plaintiffs held membership meetings of their respective organizations, in each of which the request was unanimously reaffirmed. About 380 prisoners out of a total ACI population of approximately 695 belong to these organizations.[7] On September 29, 1976, plaintiffs, on behalf of their organizations, renewed their request, which was again denied. The rea-

---

4. The procedures as originally set up in 1970 delegate the task to the Warden, the Assistant Warden, and the Business Manager. These titles have all been changed in the intervening years and the three officials named now act as the administrators of the fund.

5. "RULES FOR THE DISPENSING OF A.C.I. WELFARE FUND MONIES
 1. The authority to expend monies from the Welfare Fund shall rest in the Welfare Fund Board, which shall consist of the following persons: The Warden, the Assistant Warden and the Business Management Officer.
 2. The Welfare Fund Board may do business by majority vote and all expenditures so voted shall be restricted to purposes benefiting Adult Correctional Institutions' inmates only.
 3. The Welfare Fund Board may expend up to $100.00 for supplies and up to $50.00 for equipment. All expenditures in excess of these amounts must be submitted to the Assistant Director in charge of Correctional Services, Department of Social Welfare, for his approval.
 s/ Francis A. Howard
 Francis A. Howard
 Warden

 s/ Robert E. Houle
 Robert E. Houle
 Assistant Warden
 s/ William F. Casey
 William F. Casey
 Business Management
 Officer"

6. For instance, the leaflet recites that Rhode Island's prison system has the highest recidivism rate in the nation—81%—a cost per inmate of $42.00 per day ("and this isn't the Sheraton Plaza"); and that many of the Department of Corrections' highly paid jobs "are handed out as political patronage." The leaflet recommends itself to the voters as "a far better method than the usually unsuccessful recourse to riots or violence. No one wants another Attica."

7. The ACI holds approximately 425 men in maximum security, 200 men in medium security, and 70 men in minimum security. The organizations which voted for the proposal were located in the maximum security wing, but there is no evidence or contention that prisoners in other wings opposed the requests.

sons given in each instance were that the expenditure was a novel idea, that it was not a proper use of inmates' funds, and that it would not be beneficial to the prison population as a whole. Dissatisfied with this result, plaintiffs brought the instant action to vindicate their First Amendment rights, and now seek a preliminary injunction.

■ At the outset, it should be noted that federal courts are ill-equipped to deal with intractable problems of prison administration and reform, and properly defer to the appropriate prison authorities in these areas. *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). But as the Supreme Court has counseled, " . . . a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." (citation omitted). *Id.* at 405–406, 94 S.Ct. at 1807–1808.

■ As more fully appears below, plaintiffs have stated such a claim.[8] The Court therefore proceeds to consider the traditional factors governing requests for preliminary injunctive relief: probability of success on the merits, harm to plaintiffs if the injunction is denied, harm to the defendants if the injunction is granted, and the effect of a grant or denial upon the public interest.

## II

■ It is now settled that prison inmates do not surrender their First Amendment rights upon incarceration. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Nolan v. Fitzpatrick,* 451 F.2d 545, 547 (1st Cir. 1971). Moreover, where inmates' claims are "inextricably meshed" with the interests of persons outside of prison in communicating with them, it is appropriate for the Court to consider the First Amendment rights of such persons in weighing the constitutionality of prison practices. *Procunier v. Martinez,* 416 U.S. 396, 409, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Here the potential audience is the voting public, whose interest in the fullest possible disclosure of information bearing on future correctional policy must certainly be accorded a high place.

"[T]he condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, peculiarly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear."

*Nolan v. Fitzpatrick,* 451 F.2d 545, 547–548 (1st Cir. 1971) (footnote omitted).

*See also Pell v. Procunier,* 417 U.S. 817, 830 n.7, 94 S.Ct. 2800, 41 L.Ed.2d 224 (1974).

8. It is essential to bear in mind that on motion for preliminary injunction, the Court need only be satisfied that plaintiffs have shown a strong probability of ultimate success on the merits. It need not, at this stage of the proceedings, reach a final adjudication of the precise contours of the inmates' claimed First Amendment right to communicate with the public on an organized basis by means of mass mailings. The court in *The Luparar v. Stoneman,* 382 F.Supp. 495, 499 (D.Vt.1974) views this question as specifically reserved by the Supreme Court in *Procunier v. Martinez,* 416 U.S. 396, 408 n.11, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). This Court views footnote 11 in *Martinez* as reserving only the question of mass mailings *to* prisoners, not *by* them. Moreover, subsequent to *Martinez,* the Supreme Court held that prisoners themselves, and not merely their correspondents, as in *Martinez, supra,* retained *some* First Amendment rights. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). *See also Nolan v. Fitzpatrick,* 451 F.2d 545, 547 (1st Cir. 1971). The *Luparar* court itself concluded that inmates had a right to distribute the inmate-published newspaper both within and without the institution. 382 F.Supp. at 499. However, this Court reserves the task of balancing the plaintiffs' interest in organized communication with the general public against the legitimate state interests of security, discipline, and rehabilitation until such time as this question is fully briefed and argued by the parties.

■ The Supreme Court, in the context of censorship of prison mail, has set out the appropriate test to examine prison regulations and practices alleged to infringe First Amendment rights of prisoners and their correspondents:

"First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation.

Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad."

*Procunier v. Martinez, supra,* 416 U.S. at 413–414, 94 S.Ct. at 1811.

*See also Pell v. Procunier, supra,* 417 U.S. at 822, 94 S.Ct. 2800.

The *Martinez* test has been specifically found applicable to the problem of official interference with inmate publications. *The Luparar v. Stoneman,* 382 F.Supp. 495 (D.Vt.1974). In that case, Vermont had granted prisoners permission to use part of their welfare fund (entirely made up of state funds) to publish a newspaper. Alarmed by the contents of the publication, prison officials soon sought to suppress the newspaper. The court enjoined the suppression, holding that regulation of prison newspapers must be "no broader than is necessary to protect the legitimate governmental interests of prison security, prison order and prisoner rehabilitation." *Id.* at

501. *See also Morgan v. LaVallee,* 526 F.2d 221, 224–225 (2d Cir. 1975). As to whether prison officials could exercise prior restraint on a publication based on objections to its content, the court held that such restraint was likewise impermissible except where there was a demonstrable threat to security, order, or rehabilitation. Finally, the court declared that the First and Fourteenth Amendments mandated prison officials seeking to censor the newspaper in advance of publication to bear the burden of proving a permissible basis for interference and of extending to the prisoners a right of administrative review of their decision. *The Luparar v. Stoneman, supra,* at 501–502.

■ Upon examination of the reasons given by the Board for its action, it seems manifest to the Court that the Board's denial of plaintiffs' request to make available limited funds for the mailing of the leaflet at issue in this case cannot be sustained. The proferred justifications for the Board's denial do not begin to meet the demanding standards enunciated in such cases as *Martinez, Pell* and *The Luparar, supra.* The Board has not couched its reasons in terms of security, order, or rehabilitation nor does it appear to the Court that the stated reasons could fit in those categories without Procrustean stretching.

Defendants' first reason for denying the request was that the Welfare Fund has never been used previously for purposes such as sending out a leaflet, and that therefore they violate no First Amendment rights in simply maintaining the Welfare Fund for non-First Amendment purposes. This objection fails for two reasons. First, the only written regulation governing the distribution of the fund simply requires expenditures to be beneficial. New proposals may not be rejected simply because they are new—the proper criterion is "not beneficial." [9] Presumably there was a first time for the allocation of fund resources for

9. Although such a pronouncement is obviously not binding on the Board, the Court notes that Chief Justice Burger has declared that increased public awareness of prison problems would be beneficial. *Pell v. Procunier,* 417 U.S. 817, 830 n.7, 94 S.Ct. 2800, 41 L.Ed.2d 495. *See also Nolan v. Fitzpatrick,* 451 F.2d 545, 547–548 (1st Cir. 1971).

baseball uniforms, yet that request was not denied for being novel. The criterion of novelty does not speak to security, order, or rehabilitation. Indeed, as indicated more fully below, defendants already make funds available for First Amendment purposes, by funding an inmate newspaper. Thus their characterization of plaintiffs' request as novel would appear to be inaccurate as well as insufficient grounds for denial.

Defendants' next grounds for denial, that the distribution of the leaflet would not be a proper use of the inmates' funds, is similarly without merit. Viewed as a comment on the content of the leaflet, this statement is a "bare allegation" of the type found insufficient to justify prior restraint in *The Luparar, supra.* Ordinarily, decisions of the Board might well expect the highest judicial deference. Here however, because the First Amendment is implicated, the Court's scrutiny is necessarily more exacting. Absent any attempt to relate the finding of impropriety to any of the three permissible goals of security, order, and rehabilitation, the Court must reject defendants' second objection as a mere conclusion.

■ Finally, and more substantially, the Board found that plaintiffs' request in the instant case would not be beneficial for the inmates as a whole. Expanding on their argument at the hearing before this Court, the defendants pointed out that this could be the first of many similar requests, which would deplete funds that could otherwise be used for other beneficial purposes. As trustees, defendants argue, it is for them to safeguard the future integrity of the fund and its availability as a rehabilitative tool. The Court has no quarrel with the principle that, if there are no constitutional grounds upon which plaintiffs can validly object, defendants are free to make reasonable regulations concerning the expenditure of the Inmate Welfare Fund for First Amendment purposes, provided such regulations are in furtherance of a governmental interest "unrelated to the suppression of expression." *Procunier v. Martinez, supra,* 416

U.S. at 415, 94 S.Ct. at 1812. For example, a regulation setting aside fixed portions of the fund for recreational, educational, First Amendment and other purposes might well further the state's interest in rehabilitation. Here, however, defendants point to no such evenhanded regulation. The occasion for the Board's sudden concern about the viability of the fund is the appearance and attempted distribution of the leaflet at issue in this case, criticizing the Governor's policies for and administration of the ACI. The close juxtaposition of these two events, the fact that the fund currently has a huge surplus,[10] and the fact that defendants have made no suggestion that they have an alternative use for the $2,300 in question all lead the Court to conclude that the denial of this particular request is not related "both reasonably, *and necessarily,* to the advancement of some justifiable purpose of imprisonment." *Carothers v. Follette,* 314 F.Supp. 1014, 1024 (S.D.N.Y.1970) (emphasis added). *See Procunier v. Martinez, supra,* 416 U.S. at 407, 413, 94 S.Ct. 1800. In the factual context presented here, the Court finds that the Board's denial is related to the suppression of plaintiffs' expression.

■ Thus, none of the defendants' objections to plaintiffs' request withstand analysis under *Martinez, supra,* and *The Luparar, supra.* Defendants, however, argue that these cases are not applicable to the situation before the Court. They disclaim any intention to infringe on plaintiffs' right to distribute the leaflet. Rather, they say, they merely refused to fund plaintiffs' proposal, as they are entitled to do. *See The Luparar v. Stoneman, supra,* 388 F.Supp. at 499. The short answer to this argument is that the funds in question belong to the inmates, as defendants themselves have stipulated. We are thus faced not with a question of how the state shall expend its funds but rather how the prisoners shall dispose of their own money (albeit under the guidance of the Board).

■ More important, this argument, if accepted, would thwart the underlying pur-

---

**10.** The surplus of nearly $17,000 on July 1, 1976 was greater than the entire expenditure in 1975–1976. Current income continues to enrich the fund.

pose of the strict scrutiny given to official action where there is a substantial claim of infringement upon First Amendment values. First Amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). Although defendants disclaim any intention to censor prisoner publications, the Court must look to the effect of their actions as well as to their words. In the present case, even if the Court were to assume that the state officials enjoyed the wide discretion that would be theirs in administering the state's funds, it must also take cognizance of the fact that the Board has approved the ongoing use of the Welfare Fund to subsidize another vehicle for prisoner expression—the N.P.R.A. newspaper, which is mailed throughout the state. Thus, by their actions defendants have conceded that organized prisoner communication with the outside world is a beneficial purpose for which funds may be expended. Having made the fund available for First Amendment purposes, defendants' subsequent actions infringing upon fundamental First Amendment interests, including simple denial of a benefit, must be strictly scrutinized. *See Hathaway v. Worcester City Hospital,* 475 F.2d 701, 705 n.2 (1st Cir. 1975).

Neither the procedures followed nor the justifications offered for denial of plaintiffs' request survive the close scrutiny commanded by *Hathaway.* The rules under which the Welfare Fund is administered direct the Board to spend the money for purposes "beneficial" to the inmates. Pursuant to these regulations, the Board approved the N.P.R.A. newspaper but denied, without valid reason, the request of the majority of the ACI inmates in the present

case. This is the type of abuse of discretion condemned in *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). In that case, an organization unpopular with school officials sought, among other things, recognition as a campus organization and use of school facilities, which presumably involved some expense to the school but was essential to the organization's ability to function. The organization's request was denied on the basis that the organization's purposes were in conflict with the policies of the school. *Id.* at 174–176, 92 S.Ct. 2338. Noting that "the effect of the College's denial of recognition was a form of prior restraint," *id.* at 184, 92 S.Ct. at 2348, the court held that the burden was on the school to show that its denial of recognition was appropriate. *Id.* at 184, 92 S.Ct. 2338. *See also Toward a Gayer Bicentennial v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632, 638–639 (D.R.I.1976).

In the present case, denial of plaintiffs' request means that the plaintiffs will be unable to express their grievances in an organized fashion, by printing and sending out the leaflet to the desired audience. They are thereby denied a mode of communication different in kind from isolated individual protests, without any comparably effective alternative method of reaching the intended audience. *Cf. Pell v. Procunier,* 417 U.S. at 825–827, 94 S.Ct. 2800 (prohibition of media interviews with designated inmates furthers security interest, and, in light of alternative modes of communication, survives scrutiny). As already seen, the reasons given for denial of the request here bear no necessary or essential relationship to security, order, or rehabilitation. The conclusion is therefore inescapable that the Board has burdened a First Amendment right without the necessary justifying purpose and that its action must be set aside.[11]

11. Defendants also attempt to rely upon *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) for the proposition that plaintiffs' proposed use of funds would violate the First Amendment rights of those inmates who may not agree with plaintiffs' views expressed in the leaflet. The Court has doubts as to whether defendants

are proper parties to raise these questions. Passing that question, there is no evidence of any objection by any inmates to the proposed use of funds. Indeed, it is hard to see what "position" the leaflet takes that could possibly be objected to by any inmate at the ACI. Furthermore, defendants' argument proves too much, since it would render impermissible any

Because defendants have considered and rejected plaintiffs' request on the basis of articulated but insufficient reasons,[12] it is appropriate to order that defendants make available the funds requested, if the other criteria for injunctive relief are met. *See The Luparar v. Stoneman, supra,* 382 F.Supp. at 502.

 The other considerations relevant at the preliminary injunction stage weigh heavily in plaintiffs' favor. The threat to First Amendment freedom of expression inherent in defendants' actions necessarily entails irreparable injury to plaintiffs. *See Palmigiano v. Travisono,* 317 F.Supp. 776 (D.R.I.1970). On the other hand, defendants have not suggested, and the Court cannot perceive, any substantial injury to

funding of inmate publications. *But see The Luparar v. Stoneman,* 382 F.Supp. 495 (D.Vt. 1974). Finally, a close reading of *Street* makes clear that that case, which decides an issue of statutory construction, rests upon the particular context of a closed shop bargaining agreement and national labor policy.

themselves if they are compelled to expend plaintiffs' funds in accordance with plaintiffs' request.

Finally, the public interest clearly supports issuance of this injunction. The need for an informed citizenry, especially before an election, is indisputable.

Plaintiffs, who may well be in an excellent position to do so, seek to make a contribution to voter understanding of the baffling and complex problem of prison reform. Because plaintiffs have satisfied the requisite criteria, their motion for a preliminary injunction is granted. Counsel will prepare an order in accordance with this Opinion.

Appendix A to follow.

12. The parties have not requested a ruling on substantive regulations and procedural devices to be used by the Board in passing on future requests, and the Court expresses no views on this subject. *But see The Luparar v. Stoneman,* 382 F.Supp. 495, 501, 502 (D.Vt.1974); *cf. Procunier v. Martinez,* 416 U.S. 396, 413, 414, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

APPENDIX A

**NPRA NEWS**
NATIONAL HEADQUARTERS
P.O. Box 8273
Cranston, Rhode Island 02920

NON-PROFIT
ORGANIZATION
U.S. POSTAGE
**PAID**
CRANSTON, R.I.
**PERMIT No.621**

NOTICE: CONTENTS *PRINTED MATTERS*. MAY BE OPENED FOR POSTAL INSPECTION

# HOW TO MAKE

# CRIME PAY

# BIG $$$$$$$$$$$

WE'D PAY
POSTAGE
BUT EVERY
CENT
COUNTS

MR. RONALD THORNLEY
P.O. BOX 8273
CRANSTON, R.I. 02920

**192**

Ronald Thornley
P.O.Box 8273
Cranston, R.I. 02920

September 19, 1976

Dear Sir or Madam,

First of all I want to thank you for taking the time to answer the Journal classified ad. I must explain that I am an *INMATE* at the Adult Correctional Institutions in Cranston, and that the purpose of the ad was to call attention to one more of Governor Noel's political rip-offs. I felt that this was a far better method than the usually unsuccessful recourse to riots or violence. No one wants another Attica

Very few citizens of Rhode Island (perhaps you too) realize that there are very highly paid jobs in the Department of Corrections (some over $30,000) for which are handed out strictly as political patronage.

At present there are about six positions being held by totally unqualified personnel. These jobs are paid for out of your pocket as part of the Correctional Department budget of over $12 million a year.

For the smallest state in the union, Rhode Island does hold one record that has gone unchallenged for years - we have the *highest* recidivism rate ("repeat offenders") in the country. 81%, that is, better than 8 out of 10 inmates in prison have either been here *before* or will be *back again*. It's no joke when a man leaves the A.C.I. to have the guards say, "I'll be seeing you". The odds are definitely that he will!

We also have the 4th highest cost per man: at $15,830 per year, (that's $42.00 a day - and this isn't the Sheraton Plaza). That almost 91.7% of the 12 million-dollar budget goes for custody and control. Besides that, 98% of the men in here will be your neighbors in an average of less than a two and one half year period. All they learn for 12 million dollars a year is the desire to commit more crimes.

If you DON'T care that you are spending this kind of money and getting nothing in return, just disregard this letter. However, if you DO care, and want to help do something about it, please write to me, Ronald Thornley, Box 8273, Cranston, R.I.

Please just take another minute to fill out the enclosed questionnaire and send it to me.

Sincerely,

Ronald Thornley

P.S. We intend to submit the names of all job applicants to the state for consideration for these positions.

## QUESTIONNAIRE

PLEASE TAKE JUST A COUPLE OF MINUTES TO ANSWER THESE QUESTIONS YOU MIGHT JUST SAVE THE TAXPAYERS OF RHODE ISLAND A COUPLE OF MILLION BUCKS A YEAR!!!!!

1. Are you sick and tired of hearing about "problems" at the A.C.I.?
 YES____NO____
2. Did you ever stop to think that the Governor has it in his power to hand out these high paying jobs simply as political favors?
 YES____NO____
3. Did you have any idea that the annual budget for the Rhode Island Department of Corrections is over $12,000,000.00 per year?
 YES____NO____
4. Did you realize that as a taxpayer you are spending better than $15,000 a year to keep each inmate at the A.C.I.?
 YES____NO____
5. Did you know that the Corrections Department EMPLOYS more people than it confines?
 YES____NO____
6. Did you know that there is not a single job in the entire Department of Corrections that requires competetive testing?
 YES____NO____
7. Do you believe that inmate Family Days and Furloughs account for anywhere near the $25,000 per week in overtime pay that is being spent according to Director Bradford Southworth?
 YES____NO____
8. Do you realize that Rhode Island has the HIGHEST rate in the U.S. of repeat offenders who return to the A.C.I.? (It's currently 81%)
 YES____NO____
9. Did you know that over $200,000.00 has been spent on studies and surveys of the A.C.I. since Philip Noel took office and NOT ONE of them recommends construction of a so-called "SUPER-MAX"?
 YES____NO____
10. Would you be willing to sign a petition asking for open hearings with everyone from the Director down to individual inmates being subpoenaed to testify?
 YES____NO____
11. Do you care?
 YES____NO____

COMMENTS:
_____
_____
_____
_____

NAME: _____
ADDRESS: _____
CITY: _____STATE: _____ZIP: _____
TELEPHONE: _____

194

So far, 76 Rhode Islanders thought this ad in the Journal Classified Section was for real.... Some thought it was a joke....

learn to make license plates in your garage.

**CORRECTIONS** Personnel wanted

No experience necessary. No resume. Starting salary $35000 yearly. If interested write to Ronald Thornley, Box 8273, Cranston, R.I.

**CORRECTOR** wanted.

Newspaper needs writer to correct classified ads. Must be

# BUT WE WEREN'T KIDDING !!!! The R. I. Dept. of Corrections is in *Desperate* need of competent leadership!!!!

Leadership that knows *something* about penology. Leaders that have been *trained* and are *professional* penologists.. Only then will the debacle that is called the Department of Corrections finally be corrected. It was for this reason that the leaders of the National Prisoners' Reform Association called for the resignations of the politically appointed *princes* of the Corrections Department. Governor Noel has made a mockery of the trust placed in him by the people of the State of Rhode Island.

INMATES WELFARE FUND

STATEMENT OF INCOME & EXPENSE 1975-76 *(ending June 30, 1976)*

7/2/76
R.B

| | INCOME |
|---|---|
| Contraband | $ 397.28 |
| Commission (tele-boke) | 2673.69 |
| Donations (Christmas) | 500.00 |
| Other Income | 30.05 |
| Interest | 2842.29 |
| Transfer from store | 25000.00 |
| | $31450.31 |

| | EXPENSES |
|---|---|
| Radio & T.V.Expense | $ — |
| Instruction | 90.34 |
| Recreation & Sport | 5530.45 |
| Inmate refund | 675.17 |
| Store Expense | 4695.03 |
| Banquet & Meeting Expense | — |
| Christmas Expense | — |
| Misc. Expense | 1080.50 |
| Christmas Gifts Inmates Fam. | 503.00 |
| Postage | 181.85 |
| NPRA Newsletter | 1694.93 |
| Youth Commission | |
| | $ 14451.27 |